No. 2024-1483

# United States Court of Appeals
# for the Federal Circuit

VIASAT, INC.,

*Appellant,*

v.

WESTERN DIGITAL TECHNOLOGIES, INC.,

*Appellee.*

*Appeal from the United States Patent and Trademark Office,*
*Patent Trial and Appeal Board, IPR2022-01171*

## APPELLANT'S REPLY BRIEF

J. Scott McBride
Matthew R. Ford
Nevin M. Gewertz
Meg E. Fasulo
Ravi D. Shah
BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654
(312) 494-4400

Nosson D. Knobloch
BARTLIT BECK LLP
1801 Wewatta Street,
Suite 1200
Denver, Colorado 80202
(303) 592-3100

David Zimmer
GOODWIN PROCTER, LLP
100 Northern Avenue
Boston, Massachusetts 02210
(617) 570-1000

*Counsel for Appellant Viasat, Inc.*

NOVEMBER 20, 2024

# U.S. PATENT NO. 8,966,347 (APPX35-49)

1. [Not at issue on appeal] A method comprising:

[a] encoding data using forward error correction coding;

[b] storing the encoded data in a flash memory;

[c] retrieving the encoded data stored in the flash memory to generate a data stream;

[d] processing, using at least a first error correction sub-module, the data stream to correct errors in the data stream associated with the flash memory;

[e] monitoring a metric of the flash memory while repeating the encoding, the storing, the retrieving and the processing, wherein the metric represents memory performance degradation of the flash memory;

[f] determining that the monitored metric exceeds a threshold;

[g] in response to the determination, modifying the forward error correction coding for use in subsequently encoding data for storage in the flash memory; and

[h] in response to the determination, powering-up, from an inactive mode, a second error correction sub-module arranged in parallel with the first error correction sub-module for subsequent data stream processing.

13. A system comprising:

[a] an encoder to encode data using forward error correction coding;

[b] a flash memory to store the encoded data;

[c] a <u>decoder</u> to retrieve the encoded data stored in the flash memory to generate a data stream, and [d] to process the data stream to correct errors in the data stream associated with the flash memory using at least a first error correction sub-module; and

[e] a <u>controller</u> to:

monitor a metric of the flash memory while repeating the encoding, the storing, the retrieving and the processing, wherein the metric represents memory performance degradation of the flash memory;

[f] determine that the monitored metric exceeds a threshold;

[g] in response to the determination, modify the forward error correction coding for use by the encoder in subsequently encoding data for storage in the flash memory; and

[h] in response to the determination, powering-up, from an inactive mode, a second error correction sub-module arranged in parallel with the first error correction sub-module for subsequent data stream processing.

# CERTIFICATE OF INTEREST

Counsel for Appellant Viasat, Inc. certifies the following:

1.    The full name of every party represented by me is:

Viasat, Inc.

2.    The full name of the real parties in interest represented by me is:

None

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by me are:

BlackRock, Inc.

4.    The names of all law firms and the partners or associates that appeared for the parties now represented by me in the originating court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

Sheridan Ross PC (Robert R. Brunelli and Patrick A. Fitch)

5.    The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. See Fed. Cir. R. 47(a)(5) and 47.5(b). (The parties should attach continuation pages as necessary).

*Viasat, Inc. v. Western Digital Corp.*, No. 6:21-CV-01230-ADA (W.D. Tex.)

*Viasat, Inc. v. Kioxia Corp.*, No. 6:21-CV-01231-ADA (W.D. Tex.)

6.    Any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees):

None

November 20, 2024

*/s/ Meg E. Fasulo*
Meg E. Fasulo
*Counsel for Appellant Viasat, Inc.*

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................... 1

ARGUMENT ........................................................................................................... 4

I.     The Board Implicitly Construed Claims 13-23 ....................................... 4

II.    The Board's Implicit Construction Ignoring The Structural Aspects Of "Decoder" and "Controller" Is Wrong................................................... 9

III.   The Board's Error Was Not Harmless................................................... 14

CONCLUSION ..................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. MPH Techs. Oy,*
No. 2021-1355, 2022 WL 4103286 (Fed. Cir. Sept. 8, 2022) ..................................... 8

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP,*
616 F.3d 1249 (Fed. Cir. 2010) ................................................................... 10, 11

*CAO Lighting, Inc. v. Feit Elec. Co.,*
No. 2023-1906, 2024 WL 4503218 (Fed. Cir. Oct. 16, 2024) ................................... 11

*Carrum Techs., LLC v. Unified Pats., LLC,*
No. 2020-2204, 2021 WL 3574209 (Fed. Cir. Aug. 13, 2021) ..................................... 6

*Comcast Cable Commc'ns, LLC v. Promptu Sys. Corp.,*
838 F. App'x 551 (Fed. Cir. 2021) ................................................................... 11

*Google LLC v. EcoFactor, Inc.,*
92 F.4th 1049 (Fed. Cir. 2024) .............................................................. *passim*

*HTC Corp. v. Cellular Commc'ns Equip., LLC,*
701 F. App'x 978 (Fed. Cir. 2017) ................................................................... 11

*HTC Corp. v. Cellular Commc'ns Equip., LLC,*
877 F.3d 1361 (Fed. Cir. 2017) ....................................................................... 7

*Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n,*
22 F.4th 1369 (Fed. Cir. 2022) ...................................................................... 10

*Linear Tech. Corp. v. Int'l Trade Comm'n,*
566 F.3d 1049 (Fed. Cir. 2009) ...................................................................... 13

*Powell v. Home Depot U.S.A., Inc.,*
663 F.3d 1221 (Fed. Cir. 2011) ...................................................................... 12

**TABLE OF ABBREVIATIONS**

| Abbreviation | Term |
|---|---|
| '347 patent | U.S. Patent No. 8,966,347 |
| Cheng | U.S. Patent App. Pub. No. 2009/0276570 |
| Diggs | U.S. Patent App. Pub. No. 2009/0070651 |
| ECC | Error correcting coding |
| FEC | Forward error correction |
| Viasat | Viasat, Inc. |
| Western Digital | Western Digital Technologies, Inc. |

## STATEMENT OF RELATED CASES

No other appeal in or from the same proceeding was previously before this or any other appellate court.

This Court's decision may directly affect:

*Viasat, Inc. v. Western Digital Corp.*, No. 6:21-CV-01230-ADA (W.D. Tex.)

*Viasat, Inc. v. Kioxia Corp.*, No. 6:21-CV-01231-ADA (W.D. Tex.)

*Kioxia Corp. v. Viasat, Inc.*, No. 2024-1384 (Fed. Cir.)

## INTRODUCTION

The Board erred in its determination that claims 13-23 of the '347 patent would have been obvious in light of the prior art. These claims are structural ones, claiming a system comprising four specific components: an encoder, flash memory, a decoder, and a controller. The claims assign specific, non-overlapping functions to each of those structural components. Relevant here, the claims' decoder must both "retrieve the encoded data stored in the flash memory" and "correct errors in the data stream." Thus, a system in which tasks are allocated across components differently—for instance, one in which data retrieval is carried out by a component other than the decoder—does not infringe claims 13-23. The Board's decision improperly expanded the scope of the claims by stripping them of their structural limitations, holding that the claims cover a system that performs the specific functions regardless how those functions are allocated across components. And the Board's decision invalidating the claims rested entirely on that erroneous reading of the claims: The Board held that Diggs disclosed the decoder and controller limitations even though Diggs allocated the claimed functions across components differently than the claims. As Viasat's opening brief explained, that holding plainly depended on an erroneous claim construction.

Western Digital's responses miss the mark. Western Digital contends that the Board did not construe the claims because it said no construction was necessary and the relevant analysis appears within its discussion of the prior art. But neither is dispositive when it comes to implicit claim construction. Instead, the relevant question,

as Western Digital acknowledges, is whether the Board's ruling affects the scope or boundaries of what has been patented. *See Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1055 (Fed. Cir. 2024); Appellee Br. at 25-26. The Board's analysis unquestionably affected the scope of the claims. On Viasat's view, the claims do not read on a system similar to Diggs in which the claimed functions are assigned to different components than in the claims. On the Board's view, however, the claims do read on such a system. The Board's decision thus erased the "decoder" and "controller" limitations of claims 13-23, reducing those claim terms to nonce words defined only by the functions separately recited in the claims. The fact that the Board did not explicitly state that it was construing the claims does not matter where the Board's decision so clearly impacted the claims' preemptive scope.

Western Digital's attempt to defend the Board's claim construction also fails. Western Digital's argument is premised on its incorrect assertion that Viasat argues that the claimed decoder and claimed controller must be "physically separate." *See* Appellee Br. at 2, 32, 34, 35. Viasat is not arguing, and has never argued, that the decoder and controller must be physically separate. Rather, these two different terms must be treated as *distinct*, which is entirely consistent with their ordinary usage in this field. Even Western Digital concedes that "two components listed separately have distinct meanings," Appellee Br. at 33 (emphasis omitted), but fails to identify *any* remaining meaning of the structural "controller" and "decoder" limitations after the Board's

decision. That is because there is none: The Board's decision entirely excises the "decoder" and "controller" limitations from the claims.

Finally, Western Digital is also wrong in arguing that, even if the Board construed the claims and even if that construction were incorrect, there are still factual findings to support the outcome. The Board did not make the finding necessary to support its conclusion—that, despite Diggs' teaching of a "conventional" controller to "read data from" memory, Appx452 at ¶ 21, a skilled artisan would nevertheless understand the portion of that controller responsible for retrieving data to be a decoder. Nor could the evidence support such a finding. Western Digital never proffered evidence that a skilled artisan would ignore the clear teachings of Diggs in this way—it instead assumed away any independent meaning of the term decoder. In contrast, Viasat's expert offered undisputed testimony about how a person of skill would understand the terms decoder and controller and how they would apply to the prior art. At best, the Board simply assumed, without reasoning or support, that re-designating Diggs' controller as a decoder is just "a difference in terminology." Appx31.

In sum, none of Western Digital's responses pass muster. The Board ignored claim terms, effectively giving them no meaning. The Board ignored the claims' requirement that a decoder retrieves data from the flash memory. As a result, the Board erred in finding claims 13-23 unpatentable in the face of the uncontroverted evidence that the cited prior art used a controller, not the required decoder, to retrieve data from

flash memory. This Court should reverse the unpatentability determination as to claims 13-23.

## ARGUMENT

## I.   The Board Implicitly Construed Claims 13-23

As Western Digital acknowledges, the Board implicitly engages in claim construction when "the outcome of the analysis of the claim term establishes the scope (e.g., boundaries) and meaning of the patented subject matter." *Google*, 92 F.4th at 1055 (emphasis omitted); Appellee Br. at 25-26. That is what happened here. The Board concluded, incorrectly, that a controller that "handles data retrieval" can be a decoder—despite the claims requiring a controller that performs certain functions and, separately, a decoder that performs different functions. Appx31. In doing so, the Board nullified the structural meaning of the decoder and controller limitations.

Throughout the proceedings before the Board, the parties disputed the effect of the claims' structural limitations—specifically, the "decoder" and the "controller"—on the scope of the claims. Viasat advocated, as it does here, that the claims require particular components to perform particular functions. *See* Appx861-874; Appx1100-1105; Appx1723-1725. Just as the claims plainly say, Viasat argued that the claims require:

a **decoder**

to retrieve the encoded data stored in the flash memory to generate a data stream, and

> to process the data stream to correct errors in the data stream associated with the flash memory using at least a first error correction sub-module; and
>
> a **controller** to:
>
>> monitor a metric . . . ;
>>
>> determine that the monitored metric exceeds a threshold;
>>
>> in response to the determination, modify the forward error correction coding . . . ;
>>
>> in response to the determination, powering-up . . . a second error correction sub-module . . . .

A system in which the specific functions are not allocated across components in this way would not infringe these claims.

Western Digital disagreed and interpreted the claims more broadly. It argued that the allocation of functions across components in the claims was effectively meaningless such that "Diggs 'controller 114,' as modified by Cheng, discloses the 'decoder' of limitations 13[c]-13[d] and the 'controller' of limitations 13[e]-13[h]." Appx1401. That is, Western Digital suggested that whatever within Diggs' controller 114 is responsible for data retrieval can meet the "decoder" limitation simply because it performs the claimed function of "retriev[ing] the encoded data stored in the flash memory to generate a data stream." In Western Digital's view of the claims, the terms "decoder" and "controller" do no work: So long as something within the system handles each function (regardless of what that something is), the limitations are satisfied. Western

Digital continues to take that position. *See, e.g.*, Appellee Br. at 21 (arguing that the "dispute is whether the *controller* 114 operates as a whole to also perform the *function* of claim limitation 13[c]" (emphases added)).

The Board resolved this dispute about the scope of the claims, implicitly engaging in claim construction. In finding that "the structure disclosed by Diggs fits comfortably within the structure defined by claim 13," the Board implicitly accepted Western Digital's position that the claims' allocation of functions between the "decoder" and "controller" does not limit the claims' scope. Appx31. Although couched in the teachings of Diggs, the Board decided that a controller that "handles data retrieval . . . is not inconsistent with claim 13," even though claim 13 allocates data retrieval to the decoder, not the controller. *Id.* In other words, the Board effectively rewrote the claims by reading them to require only the specified functions without allocating the functions to specific components within the system. That is claim construction.

Western Digital offers no serious argument as to how the Board's decision did not "establish[] the scope (e.g., boundaries) and meaning of the patented subject matter." *Google*, 92 F.4th at 1055. It suggests that the Board could not have implicitly construed the claims because the relevant analysis occurred in the context of analyzing the prior art. *See* Appellee Br. at 24-25. But the heading under which claim construction occurs does not answer the question of whether the Board engaged in claim construction. *See, e.g., Carrum Techs., LLC v. Unified Pats., LLC*, No. 2020-2204, 2021 WL

3574209, at *5 (Fed. Cir. Aug. 13, 2021) ("the Board implicitly adopted a construction of the phrase at issue" in its obviousness analysis); *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361, 1367 (Fed. Cir. 2017) (challenge to "Board's interpretation of the term 'message' as applied by the Board in its anticipation analysis" is a claim construction dispute). The Board's ultimate holding that Diggs disclosed the relevant claim limitations turned not merely on factual findings about how a skilled artisan would have read Diggs, but also on the conclusion that the claims' specific allocation of functions across components has no substantive impact on the claims' scope. That is exactly what this Court has recognized to be an implicit claim construction. And that construction was critical to the Board's holding that Diggs discloses the claims' "controller" and "decoder" limitations.

Western Digital also notes, repeatedly, that the parties did not request a formal construction of the claims. But, under this Court's precedent, that does not matter where, as here, the Board's decision determines the scope of the claims. *See, e.g.*, *Google*, 92 F.4th at 1056 ("the Board's statement that it was not engaging in claim construction is not dispositive as to whether claim construction occurred"); *HTC*, 877 F.3d at 1367 ("Despite no express construction . . ., Board findings establishing the scope of the patented subject matter may fall within the ambit of claim construction."). Viasat advanced to the Board the same argument it makes on appeal, Appx1100-1105, Appx1723-1725, and the Board's rejection of that argument amounts to a determination about the scope and boundaries of the claims of the '347 patent.

This Court's analysis in *Google* is not inapposite. *See* Appellee Br. at 25. In *Google*, the Board stated it was not construing any claim limitations but did so anyway when it determined that five claimed inputs must be distinct from each other. *See Google*, 92 F.4th at 1056. The Court held that "[t]o determine, as the Board did, that no input can be based in part on another input and that each input must be distinct, is to establish a limit to the scope of the [] claim limitation," and therefore "the Board's assessment resulted in a construction of the claim." *Id.* What mattered was that "the outcome of the Board's assessment established the scope of the[] limitation." *Id.*; *see also id.* ("[t]he limiting *impact* of the Board's determination" (emphasis added)). As in *Google*, the Board's claim construction here is "evidenced by the Board's rejection of [Viasat's] argument" and its acceptance of Western Digital's. *Id.* Its basis for accepting Western Digital's argument "would evaporate" under the interpretation of the claims Viasat seeks. *Id.* Again, Western Digital offers no serious argument as to how the Board's decision did not, as in *Google*, "establish[] the scope of the[] limitation." *Id.*

Nor is this Court's analysis in *Apple v. MPH* irrelevant. *See* Appellee Br. at 25-26. There too, the Board implicitly performed claim construction when it found that the "plain words of the claim" require an entire message to be encrypted—rather than just a portion of the message. *Apple Inc. v. MPH Techs. Oy*, No. 2021-1355, 2022 WL 4103286, at *4 (Fed. Cir. Sept. 8, 2022) (emphasis omitted). As in *Apple*, the Board's analysis here "established what was and was not required" by the claims. Appellee Br. at 26. The Board established that a structure that a skilled artisan would understand as

a decoder was not needed to meet the claim limitation of "a decoder to retrieve the encoded data." Instead, a structure that all parties agree is a controller could meet that limitation because the Board brushed off the allocation of functions across structures within the system as substantively irrelevant. *See* Appx31 (a "portion of controller 114 handles data retrieval").

The Board's reference to "a difference in terminology" illustrates the problem. *Id.* The Board treated the claims' distinction between a controller and a decoder as mere semantics and reduced those structures to their recited functions. Otherwise, the Board could not have found that a component everyone agreed is a controller is instead the decoder required by the claims. *See, e.g.*, Appx1218 at 58:9-18, Appx1229 at 69:19-23 (Western Digital's expert agreeing that the prior-art controller retrieves the stored data). Those terms—controller and decoder—have structural meanings that the Board wholly elided.

## II. The Board's Implicit Construction Ignoring The Structural Aspects Of "Decoder" and "Controller" Is Wrong

The most glaring problem with Western Digital's argument is that, on its view, the claims' allocation of functions across components does no work. On Western Digital's view, these claims would have exactly the same meaning if they did not identify structural components at all. Western Digital cannot seriously dispute this. While Western Digital insists that its position would not excise the structural limitations from

the claims, Appellee Br. at 39-40, it never explains *why* that is the case or *how* the structural limitations would, on its view, limit the claims' scope.

Perhaps recognizing this problem, Western Digital spends the majority of its brief attacking a claim construction that Viasat does not propose. Viasat does not contend that the claimed decoder and controller must necessarily be "physically separate components." Appellee Br. at 32; *see also id.* at 34-35. Indeed, the word "physically" does not appear even a single time in Viasat's opening brief. Western Digital's argument is nothing more than a distraction.

Instead, on Viasat's view, the claimed decoder and controller must merely be *distinct* components that a skilled artisan would understand as different terms with different meanings.[1] *See* Appx1158-1159 at ¶¶ 127-130. That is evident from the plain language of the claims, which recite a number of different structures present in the claimed system: "an encoder," "flash memory," "a decoder," and "a controller." As here, "[w]here a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention." *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010); *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1382 (Fed. Cir. 2022) (where the claims identify "distinct components," there is "a presumption that those

---

[1] Decoder and controller are terms of art for a person skilled in the area of the '347 patent. *See* Appx1158 at ¶ 128. Western Digital did not argue that anything other than the ordinary definition of those terms applies. Appx80.

components are distinct"); *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 701 F. App'x 978, 982 (Fed. Cir. 2017) ("The separate naming of two structures in the claim strongly implies that the named entities are not one and the same structure."); *see also CAO Lighting, Inc. v. Feit Elec. Co.*, No. 2023-1906, 2024 WL 4503218, at *4 (Fed. Cir. Oct. 16, 2024) (reversing district court's construction where the district court failed to distinguish a "substrate" and a "first reflective layer" which were distinct elements listed separately in the claim language); *Comcast Cable Commc'ns, LLC v. Promptu Sys. Corp.*, 838 F. App'x 551, 553 (Fed. Cir. 2021) (affirming Board's construction where the Board found "speech recognition system" and "wireline node" were distinct elements because the claim language listed them separately). The claims thus do not require, as Western Digital suggests, that the different structural components be implemented on different circuits, but merely that they be distinct in a way that a skilled artisan would recognize.

Western Digital agrees that "two components listed separately have distinct *meanings*" but suggests that "such language carries only an implication of distinct *structures*." Appellee Br. at 33. Regardless, both Western Digital and the Board ignored the distinctness of the decoder and controller. The Board's treatment obliterated any distinctness—whether meaning or structural—when it reduced the "decoder" to the bare functions associated with it in the claims. The Board effectively erased the term "decoder" from the claim altogether, giving that word no independent meaning. *See, e.g., Becton, Dickinson*, 616 F.3d at 1257 ("Simply put, a claim construction that does not

require a spring member in addition to the hinged arm structure renders the spring means limitation functionally meaningless.").

Even treating the plain language of the claims as "merely a starting point," Appellee Br. at 33, the intrinsic evidence supports concluding that the claimed decoder and controller are distinct components. Every figure of the '347 patent that depicts both a decoder and a controller shows them separately. *See* Appx35; Appx37; Appx39; Appx40. Throughout the specification, the decoder and controller are referred to using different numbers. *See, e.g.*, Appx45 at 3:26-28 ("The system includes an encoder 105, flash memory 110, a decoder 115, and a controller 120."); Appx46 at 6:31-40. And the decoder and controller have separate detailed descriptions explaining what they are and how they function. *See* Appx46-47 at 5:49-7:12 (decoder); Appx47 at 7:13-8:42 (controller).

The claims and intrinsic evidence uniformly show that these are distinct components. There is no suggestion that the decoder can be the controller or that the controller can be the decoder—let alone that the functions the claims assign to the decoder can be split across multiple components. Thus, this case is nothing like *Powell v. Home Depot*, in which the claimed "cutting box" and the claimed "dust collection structure" were not required to be distinct because "the specification teaches that the cutting box may also function as a 'dust collection structure' to collect sawdust and wood chips generated during the wood cutting process." *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231-32 (Fed. Cir. 2011). Nor is this case like *Linear Technology*,

where the Court found that "'second circuit' and 'third circuit' can contain overlapping components" as long as they both "perform their stated functions." *Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1055-56 (Fed. Cir. 2009). The Board here reassigned half of the decoder's stated function (data retrieval) to the controller, hence stripping the claims' division of functions between the decoder and controller of any meaning.

Western Digital invokes a separate patent in the family to say that the decoder and controller are not distinct. Appellee Br. at 34-35. But the '700 patent's claim language merely confirms Viasat's position—that being *physically* separate is not synonymous with being distinct and is irrelevant to the issues at hand. The language Western Digital relies on in the '700 patent concerns two sub-components found *within* the decoder—it says nothing of the distinctness of the decoder and controller. Additionally, the '700 patent includes the same disclosure that "[t]hese components and sub-modules therein may, individually or collectively, be implemented with one or more Application Specific Integrated Circuits (ASICs) . . . [or] performed by one or more other processing units (or cores), on one or more integrated circuits." Appx46 at 5:64-6:3. Thus, the '700 patent confirms that physically separate sub-components are physically separate even when residing on the same ASIC.

The Board, and Western Digital, rely heavily on how the decoder and controller are implemented in circuitry to evade the plain language of the claims. Appx31; Appellee Br. at 34-37. But the question is not whether the claimed decoder is comprised of

multiple circuits. The question is also not whether the claimed decoder and claimed controller reside on the same ASIC. Nor is the question whether the decoder and controller reside within "tidy" boxes or are "spread across multiple boxes." Appellee Br. at 24. The relevant question is whether there is a structure that a skilled artisan would recognize as a "decoder" that performs the recited data retrieval and decoding functions and whether there is another structure that a skilled artisan would recognize as a "controller" that performs the error-monitoring functions. That is what the claims require.

## III. The Board's Error Was Not Harmless

The Board's error here is not harmless. Under the correct construction, there is no evidence that Diggs' controller 114—the part of Diggs that indisputably retrieves data from flash memory—is part of any decoder. Indeed, Western Digital's harmless error argument largely suffers from the same claim-construction error as the Board's decision: It seeks to brush aside the claims' requirement that there be some distinction between the controller and encoder.

The Board found that "Diggs' controller 114 as a whole (including ECC detection and correction module 125) performs the recited *functions* of a 'decoder.'" Appx31 (emphasis added). There is no dispute there. The Board also stated that "another portion of controller 114 handles data retrieval." *Id.* That is also undisputed. But the Board did not make the factual finding necessary to support a finding of unpatentability under the correct claim construction—that, despite its name, a skilled

14

artisan would nevertheless understand that the portion of controller 114 responsible for data retrieval is a "decoder."[2] The Board only pointed to something within the controller ("another portion of controller 114") that performs the function of data retrieval without any actual consideration, reasoning, analysis, or factual finding of whether a skilled artisan would consider that "portion" to be a decoder or something else. *See* Appx31.

No evidence could support a finding that a skilled artisan would consider the combination of ECC module 125 and the other portion of controller 114 that performs data retrieval to be, collectively, the "decoder," while the remaining portions of controller 114 are the controller. That understanding would fly in the face of Diggs' clear disclosure: "As is conventional, the controller 114 is configured to write data to, and read data from, the storage array 116 in response to commands from the host 110." Appx452 at ¶ 21. In other words, it was conventional for a *controller* to be responsible for data retrieval, and Diggs disclosed a conventional controller that does just that. There is no basis for the Board to find otherwise.

---

[2] Western Digital incorrectly suggests that this "boil[s] down to a factual dispute over whether the controller 114 of Diggs includes one or two 'decoder' portions that operate together as a whole to perform the functions recited in limitations 13[c] and 13[d]." Appellee Br. at 25. Viasat does not contend that the number of decoder portions matters at all. What matters is whether there is a structure that a skilled artisan would recognize as a decoder that performs the functions enumerated in the claims.

Additionally, Western Digital never argued for this "portion" interpretation of Diggs. In its petition, Western Digital only pointed to controller 114 as a whole for satisfying claim 13's limitations: "For clarity, the 'decoder' of limitations 13[c]-13[d] and the 'controller' of limitation 13[e]-13[h] are disclosed by Diggs' controller 114 as modified by Cheng, as discussed in the corresponding claim 1 limitations above." Appx130. In the corresponding analysis of claim 1, Western Digital relied on controller 114 as satisfying the data-retrieval function with little analysis. *See* Appx95-97. That is, Western Digital's position was based solely on controller 114 performing the recited functions of the claimed decoder. *See, e.g.,* Appx1815 at 23:22-24 (Western Digital agreeing that "the petition points to controller 114 of Diggs, and says that it can perform the *functions* of the encoder, decoder, and controller of Claim 13." (emphasis added)). Western Digital never posited that a skilled artisan would understand the portion of controller 114 responsible for retrieving data to be a decoder.

Western Digital's expert likewise did not opine that the portion of controller 114 responsible for data retrieval would have been understood as a decoder. Her declaration largely mirrors Western Digital's petition, with no analysis about why a person of skill would jettison both the label Diggs gives to its controller and Diggs' statement that, as is conventional, its controller reads data from memory, and instead understand a decoder to be responsible for retrieving data from flash memory. *See* Appx417-418. Rather, she opined "that Diggs and Cheng disclose a system that performs the method of claim 1" and that therefore "claim 13 is disclosed and rendered obvious by Diggs

and Cheng for the same reason that Diggs and Cheng disclose and render obvious claim 1." Appx417 at ¶ 221. That is the entire claim 13 analysis.

Western Digital's expert's claim 1 analysis does not close the gap to conclude that a skilled artisan would consider the portion Diggs' controller 114 responsible for data retrieval to be anything other than a controller. Instead, she agreed that "Diggs discloses that 'As is conventional, the controller 114 is configured to write data to, and read data from, the storage array 116 in response to commands from the host 110.'" Appx373374 at ¶ 89; *see also* Appx411 at ¶ 199 (similar); Appx415 at ¶ 213 ("Subsequent retrieval of data previously stored in memory is a fundamental and conventional memory system operation"). Here too, the expert testimony confirmed that controller 114 is the component in Diggs that retrieves data and never opines that this portion of controller 114 is better understood as a decoder. *See* Appx377-379; Appx371 at ¶ 81 ("Diggs discloses that 'The controller 114 of storage subsystem 112 is further configured with non-volatile memory (NVM) commands 124,' *e.g.*, read and write commands, that 'may be used to access storage array 116 of the storage subsystem 112 in response to data and instructions received by the controller 114 from host system 110.'"); Appx414 at ¶ 210 ("In particular, Diggs states, with reference to Figure 2, that when a read instruction is received by controller 114 from the host 110 then 'the requested data, ECC data, and ECC size data 121 are read from the storage array 116.'"). All the evidence Western Digital cites is more of the same—pointing out that controller 114 retrieves data without providing any justification or rationale for why a skilled

artisan would ignore the "controller" label Diggs gave to that structure and instead rename it as a decoder. *See* Appellee Br. at 29-30.

Rather, the undisputed evidence says otherwise. Appx1158-1159 at ¶¶ 127-130. Viasat's expert explained that "[a] controller is generally a processor that controls the flow of data and certain operations on that data," whereas a decoder "is generally specialized circuitry that detects and corrects errors." Appx1158 at ¶ 128. Because those are different terms with different structures, a skilled artisan would not use those terms interchangeably. Appx1158 at ¶ 129. Therefore, a skilled artisan would have taken Diggs at its word: When it says that its conventional controller 114 performs a step, a controller performs that step. *Id.* Everyone, including the Board, agrees that Diggs' "controller 114 handles data retrieval." Appx31; Appellee Br. at 3 ("Diggs's controller 114 performs the data retrieval function recited in limitation 13[c].").

Western Digital seems to suggest that this undisputed expert testimony about a skilled artisan's understanding of decoder and controller should be discounted because "Viasat's expert did not opine on whether the terms 'decoder' and 'controller' of claim 13 must be 'separate components.'" Appellee Br. at 31. But Western Digital misreads Viasat's expert testimony for the same reason that it believes that Board did not engage in claim construction—it assumes that because the opinion was offered in the context of analyzing the prior art, it cannot be relevant to understanding those claim terms more generally. Western Digital ignores that Viasat's expert began by analyzing the language of the claim:

> Claim 13 of the '347 patent requires "a decoder to retrieve the encoded data stored in the flash memory to generate a data stream, and to process the data stream to correct errors in the data stream associated with the flash memory using at least a first error correction sub-module." [Appx49] at 11:44-48. Claim 13 *separately* requires "an encoder to encode data using forward error correction coding" and "a controller to" perform separate functions, such as "monitor a metric of the flash memory." *Id.* at 11:41-42, 11:49-12:10.

Appx1157 at ¶ 125 (emphasis added). And then he turned his attention to how a skilled artisan would understand these terms both generally and in the context of Diggs specifically. Appx1157-1159 at ¶¶127-130. Viasat's expert opined that a skilled artisan would not use the terms "interchangeably" because a skilled artisan would understand these terms to refer to distinct components with distinct functions. Appx1158 at ¶¶ 128-129. As that applies to Diggs, a skilled artisan would not understand controller 114 to be the claimed decoder. Appx1158-1159 at ¶¶ 128-130.

On appeal, Western Digital seems to offer a different understanding of the Board's decision—that the entire "controller 114 … as a whole is properly characterized as a decoder as opposed to a controller." Appellee Br. at 28. But that does not solve the Board's problematic analysis. If the Board understood Diggs' controller 114 in its entirety to be the decoder, then the decoder would be performing all the steps of the controller. That again disrespects the language of the claims, which requires both a decoder and a controller, each with its own specific functions.

The Board's error was not harmless, and the record does not support the Board's ultimate conclusion that claims 13-23 are obvious under the construction that Viasat

has advanced from the outset. Simply put, claims 13-23 have different requirements from claims 1-11 and the Board's error, and Western Digital's on appeal, is to ignore that distinction between the claims. Accordingly, the Board's conclusion should be reversed.

## CONCLUSION

For these reasons, Viasat respectfully requests that the Court reverse the Board's determination that claims 13-23 of the '347 patent would have been obvious.

November 20, 2024

Respectfully submitted,

*/s/ Meg E. Fasulo*

J. Scott McBride
Matthew R. Ford
Nevin M. Gewertz
Meg E. Fasulo
Ravi D. Shah
BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
Tel: (312) 494-4400
scott.mcbride@bartlit-beck.com
matthew.ford@bartlit-beck.com
nevin.gewertz@bartlit-beck.com
meg.fasulo@bartlit-beck.com
ravi.shah@bartlitbeck.com

Nosson D. Knobloch
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Tel: (303) 592-3100
nosson.knobloch@bartlit-beck.com

David Zimmer
GOODWIN PROCTER, LLP
100 Northern Avenue
Boston, MA 02210
Tel: (617) 570-1000
dzimmer@goodwinlaw.com

*Counsel for Appellant Viasat, Inc.*

**CERTIFICATE OF COMPLIANCE**

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared using a proportionally spaced typeface using Microsoft Word 365 in 14-point, Garamond font and includes 5,006 words.

November 20, 2024

/s/ Meg E. Fasulo
Meg E. Fasulo
BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
Tel: (312) 494-4400
meg.fasulo@bartlit-beck.com

*Counsel for Appellant Viasat, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2024, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Federal Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

November 20, 2024

*/s/ Meg E. Fasulo*
Meg E. Fasulo
BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
Tel: (312) 494-4400
meg.fasulo@bartlit-beck.com

*Counsel for Appellant Viasat, Inc.*